JUSTICE McKINNON,
concurring.
¶81 I believe the Court’s Opinion correctly resolves Beach’s present appeal under the test we articulated in Beach’s prior appeal, Beach v. State, 2009 MT 398, 353 Mont. 411, 220 P.3d 667 (Beach I), and I have thus signed the Opinion. However, in my view, our decision in Beach I confused the law governing postconviction “innocence” claims, and for this reason I would limit Beach Fs application to the present case. In future cases, I would instead apply the legal standards and analysis set forth below. As a starting point for this discussion, I review relevant points from Beach’s trial.
I. Beach’s Trial
¶82 “[I]n state criminal proceedings the trial is the paramount event for determining the guilt or innocence of the defendant.” Herrera v. Collins, 506 U.S. 390, 416, 113 S. Ct. 853, 869 (1993). For Beach, that “paramount event” took place over a five-day period in 1984, commencing April 9 and concluding April 13.
¶83 One of the central issues at trial concerned the validity and truthfulness of Beach’s confession to the crime. This was because, as prosecutor Marc Racicot conceded to the jury in closing argument, there was no reliable physical evidence retrieved from the crime scene pointing specifically to Beach as the perpetrator of Kim Nees’s death. Moreover, as Racicot also conceded, the investigation had been mismanaged and certain evidence had been contaminated, thus rendering it unusable, due to improper police procedures. For instance, footprints at the crime scene were inconclusive because investigators *200 from five different agencies had walked over the area in the course of collecting evidence, and no record had been kept of the type of shoe each officer was wearing or whether any of them had been barefoot (from wading into the river). A towel containing blood that did not match Nees or Beach had been placed in custody with other evidence, yet it was not known when and where the towel was found. Investigators had found a bloody palm print on the exterior passenger side of the pickup, but they were unable to determine who had left it. Hair evidence also had been mishandled.
¶84 Defense counsel, Charles F. “Timer” Moses, emphasized in his closing argument the lack of physical evidence tying Beach to the crime. He focused on law enforcement’s careless investigative procedures and mishandling of evidence, and also criticized the prosecution’s failure to produce certain evidence at trial. For example, he noted that the prosecution had failed to introduce photographs of the bloody palm print, failed to call an expert to discuss blood typing, failed to provide information about other fingerprints (not belonging to Beach) found at the scene, failed to produce photographs of the blood inside the pickup, failed to explain whether hair samples taken from Beach matched hair found at the scene, failed to produce photographs of the footprints, failed to introduce any testimony that the drag line was consistent with a garbage bag, and failed to explain the significance of the bloody towel. In short, Moses portrayed the State’s case as full of holes, riddled with unexplained questions, and devoid of critical evidence.
¶85 Given the undisputed shortcomings with the physical evidence, the prosecution relied heavily on Beach’s confession. Indeed, Racicot told the jurors that the confession was “the focal point of this whole inquiry.” He argued that their decision in the case boiled down to two questions: “Was [the confession] voluntarily made? And is it true?” In this regard, Racicot stated that the jury had to assess the credibility of the four officers (Sergeant Via, Commander Calhoun, Lieutenant Cumming, and Deputy Medaries) who had contact with Beach when he was in custody in Louisiana and who had testified at Beach’s trial about his incriminating statements. Racicot acknowledged to the jurors that if they did not believe the officers’ testimony-if they found that the officers had testified untruthfully about the circumstances surrounding Beach’s confession-then the jurors should find Beach not guilty. But if they believed the officers and found that Beach’s confession was voluntary and truthful, then the jurors should find Beach guilty.
*201 ¶86 Racicot and Moses addressed these questions with the jury in detail. Of particular note, Racicot argued that the confession was true because it included facts that had not been revealed to the public and that even law enforcement officers had not known at the time. Moreover, the confession included intimate and minute details about how the murder occurred, and most of those details were corroborated by independent evidence. For example, the location of blood inside and outside the pickup and the location and nature of the wounds on Nees’s body were consistent with Beach’s description of repeatedly hitting her with a 12-inch crescent wrench inside the pickup and then a tire iron outside the pickup. There were gouge marks in the ceiling of the pickup and on the steering wheel, which B.each presumably created when, as stated in his confession, he repeatedly struck Nees with the crescent wrench inside the pickup. Nees’s father testified that when the police returned his property from the pickup, a 12-inch “chrome” crescent wrench was missing from his tool collection, which was consistent with Beach’s statement that he had used a 12-inch “chrome” crescent wrench to beat Nees and had then tossed the crescent wrench (and the tire iron) into the Poplar River. Doctor Pfaff s testimony about a postmortem injury on Nees’s back corroborated Beach’s description of dragging Nees over to the river after killing her. The presence of blood by the pickup and by the river bank-together with the lack of blood along the drag trail between those two points-was consistent with Beach’s explanation that he had placed Nees’s body in a garbage bag in order to drag her to the river. The condition in which the pickup had been found-in park, radio on, CB off, and heater on-was consistent with Beach’s statement that he and Nees had been sitting in the pickup in a stationary position. Beach stated that he had removed Nees’s purse from the pickup and laid it outside the pickup, which is where investigators found it. Beach stated that he had wiped his fingerprints off the vehicle, which was consistent with the fact that none of his fingerprints were found. Beach stated that he had thrown the pickup keys into the river, which was consistent with the fact that law enforcement never found the keys. Racicot argued that all of these consistencies corroborated and demonstrated the truthfulness of Beach’s confession.
¶87 Moses, on the other hand, pointed to the absence of corroboration between certain details. For example, Beach had stated that he threw Nees’s jacket down by her body, yet no jacket was found there when investigators arrived several hours later. The garbage bag Beach had referred to in his confession was never found either. Moses also *202 discussed the fact that, prior to Beach’s interrogation, the Louisiana officers were in contact with the Roosevelt County Sheriffs Office and received information about the circumstances of Nees’s murder. Indeed, Sergeant Via admitted at trial that he had obtained background information from Montana authorities before he questioned Beach “[s]o that ... we would know what he was talking about” during the interview and “so that [we] could ask Mr. Beach the appropriate questions.” Moses suggested, however, that Beach was mentally unstable at the time of the interview and could not have given appropriate and voluntary responses to the officers’ questioning. Moses implied that, during the five or six hours preceding Beach’s recorded statement, the officers confronted Beach with the facts and details supplied by the Roosevelt County Sheriffs Office and intimidated Beach into giving a confession which incorporated those facts and details.
¶88 The jury rejected the notion of a conspiracy among Montana and Louisiana law enforcement officials to secure a false confession from Beach. The jury implicitly credited the Louisiana officers’ testimony and found that Beach’s confession was both voluntary and truthful. The jury returned a verdict of guilty on the charge of deliberate homicide, finding beyond a reasonable doubt that Beach had bludgeoned Nees to death with a crescent wrench and a tire iron on June 16, 1979.
II. Beach’s Direct Appeal and First State Postconviction Petition
¶89 Beach filed a direct appeal to this Court in October 1984, raising five issues: (1) the district court lacked jurisdiction to try him for deliberate homicide; (2) the district court, after granting his first motion to change venue, erred in denying his second motion to change venue; (3) the district court erred in denying his motion to suppress his confession, since the confession was tainted by constitutional violations and procedural irregularities; (4) the district court erred in not giving the jury a particular instruction regarding mental state; and (5) the district court abused its discretion by imposing the maximum possible sentence. Beach did not argue on appeal that the evidence adduced at trial was insufficient to support his conviction of deliberate homicide. This Court affirmed Beach’s conviction, concluding that none of the issues he had raised on appeal entitled him to relief. State v. Beach, 217 Mont. 132, 705 P.2d 94 (1985).
¶90 Beach filed his first petition for state postconviction relief in October 1995-more than six years past the statutory deadline for filing *203 such petitions-raising the same claims he had raised on direct appeal concerning his confession, plus a claim that his trial counsel had been ineffective. He also asserted that his confession was false. This Court determined that Beach’s claims were barred, however, because they had already been decided against him on direct appeal or because he could have raised them (but did not) on direct appeal or in a timely postconviction petition. We further held that Beach had not presented any “new evidence” that would justify an equitable exception to the statute of limitations. Accordingly, we dismissed his first petition in February 1996. Beach v. Day, 275 Mont. 370, 913 P.2d 622 (1996).
III. Beach’s Second State Postconviction Petition
¶91 Beach is now in his second round of postconviction proceedings in state court. He filed his second petition for state postconviction relief on January 18, 2008. This time, he pursued two separate and distinct avenues of relief, which are critical to an understanding of the legal issues presented in this case.
A. Statutory Exception under § 46-21-102(2), MCA
¶92 In his first avenue of relief, Beach sought to take advantage of a change in the law. Prior to 1997, a petition for postconviction relief could be filed within five years of the date of the conviction. Section 46-21-102, MCA (1995). Under this provision, Beach had until May 1989 to file a timely postconviction petition. In 1997, the Legislature shortened the filing period to one year from the date that the conviction becomes final. Section 46-21-102(1), MCA (1997). In addition, however, the Legislature enacted a new statutory exception to the deadline, allowing a claim of factual innocence to be brought in a petition filed within one year of discovering the evidence upon which such claim is predicated. Section 46-21-102(2), MCA (1997). Beach invoked § 46-21-102(2), MCA, as authority for bringing a claim of innocence.
¶93 In Crosby v. State, 2006 MT 155, 332 Mont. 460, 139 P.3d 832, we adopted a method of analysis for claims brought under § 46-21-102(2), MCA. We first reviewed the “newly discovered evidence” test set forth in State v. Clark, 2005 MT 330, 330 Mont. 8, 125 P.3d 1099. Crosby, ¶¶ 18-19. That test was conceived to address a timely motion for a new trial filed by the defendant under § 46-16-702, MCA, within 30 days following a guilty verdict. See Clark, ¶ 27 n. 3. A motion for a new trial under this statute may be granted “in the interest of justice.” Section 46-16-702(1), MCA. To prevail on such a motion grounded on newly discovered evidence, we held that the defendant must show:
(1) The evidence must have been discovered since the defendant’s *204 trial;
(2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant’s part;
(3) the evidence must be material to the issues at trial;
(4) the evidence must be neither cumulative nor merely impeaching; and
(5) the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.
Clark, ¶ 34. We deemed it appropriate in Crosby to apply this five-factor test to a timely postconviction petition filed under § 46-21-102(2), MCA. Crosby, ¶¶ 15, 20.
¶94 In light of Crosby, Beach based his first avenue of relief on the Clark test. Also, because § 46-21-102(2), MCA, requires a claim of innocence based on newly discovered evidence to be filed within a year of discovering the evidence, Beach limited his analysis under Clark to the evidence he had discovered on and after January 19, 2007. He argued that this evidence established that persons other than Beach caused Nees’s death. He requested that his conviction and sentence be vacated and that he be granted a new trial. Beach did not allege any constitutional claims in conjunction with this avenue of relief; he simply argued that his evidentiary showing satisfied Clark and warranted a new trial.
B. Fundamental Miscarriage of Justice Exception under Schlup
¶95 Beach’s second avenue of relief, in contrast, did involve constitutional claims. His analysis here was based on the “fundamental miscarriage of justice” exception articulated by the Supreme Court in Schlup v. Delo, 513 U.S. 298, 115 S. Ct. 851 (1995), and adopted by this Court in State v. Redcrow, 1999 MT 95, 294 Mont. 252, 980 P.2d 622, and State v. Pope, 2003 MT 330, 318 Mont. 383, 80 P.3d 1232. This exception is a judicially recognized doctrine that applies to situations where a convicted person seeks review of constitutional claims arising out of his original trial, but the claims are barred for procedural reasons, such as the statute of limitations or a rule prohibiting successive petitions. Schlup, 513 U.S. at 313-22, 115 S. Ct. at 860-64; Sawyer v. Whitley, 505 U.S. 333, 339, 112 S. Ct. 2514, 2518-19 (1992); Redcrow, ¶¶ 31-34; Pope, ¶¶ 51-55; see also §§ 46-21-102(1), -105(1)(b), MCA. If the claims are barred, and if the court is persuaded that refusing to entertain them could result in a fundamental miscarriage of justice, then the court may excuse the procedural bar and review the claims on the merits.
*205 ¶96 The Supreme Court and this Court have tied “miscarriage of justice” in the present context to the postconviction petitioner’s innocence. Schlup, 513 U.S. at 321, 115 S. Ct. at 864; Redcrow, ¶¶ 33-34; Pope, ¶ 55. This was done “[t]o ensure that the fundamental miscarriage of justice exception would remain ‘rare’ and would only be applied in the ‘extraordinary case,’ while at the same time ensuring that the exception would extend relief to those who were truly deserving.” Schlup, 513 U.S. at 321, 115 S. Ct. at 864. As a result, “even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a [postconviction] court to reach the merits of a barred claim.” Schlup, 513 U.S. at 316, 115 S. Ct. at 861. In addition to alleging a constitutional violation, the petitioner also must present “new evidence of innocence.” Schlup, 513 U.S. at 316, 115 S. Ct. at 861. Restated, he must “supplement! ] his constitutional claim with a colorable showing of factual innocence.” Kuhlmann v. Wilson, 477 U.S. 436, 454, 106 S. Ct. 2616, 2627 (1986) (plurality). A sufficient showing of factual innocence, coupled with an alleged constitutional error in the original trial, warrants application of the miscarriage of justice exception. In essence, the exception functions as “a safety valve for the extraordinary case,” Schlup, 513 U.S. at 333, 115 S. Ct. at 870 (O’Connor, J., concurring) (internal quotation marks omitted), where the court is persuaded that “a constitutional violation has probably resulted in the conviction of one who is actually innocent,” Schlup, 513 U.S. at 321, 115 S. Ct. at 864 (internal quotation marks omitted). In such a case, the societal interests in finality and conserving judicial resources must yield to the imperative of correcting a fundamentally unjust incarceration. Schlup, 513 U.S. at 320-21, 324, 115 S. Ct. at 864, 865.
¶97 Conversely, it is important to be clear that the petitioner’s claim of innocence in this situation “does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity of his [underlying constitutional] claims.” Schlup, 513 U.S. at 315, 115 S. Ct. at 861. An adequate showing of innocence merely entitles the petitioner to receive review of those underlying claims. In this respect, demonstrating innocence is the “gateway” through which the petitioner must pass in order to have his otherwise barred constitutional claims considered on the merits. Schlup, 513 U.S. at 315, 115 S. Ct. at 861. If the petitioner “presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonbarmless constitutional *206 error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.” Schlup, 513 U.S. at 316, 115 S. Ct. at 861.
¶98 Based on Schlup, Beach alleged three constitutional errors in his original trial: (1) the State failed to disclose evidence; (2) the prosecutor misstated facts and referred to nonexistent evidence, thus denying Beach a fair trial; and (3) defense counsel rendered ineffective assistance. He argued that his new evidence of innocence was strong enough to get him through the gateway and have these barred claims reviewed on the merits. In this regard, a court assessing a claim of actual innocence under the miscarriage of justice exception must consider “all” the evidence-old and new. Schlup, 513 U.S. at 327-28, 115 S. Ct. at 867; House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 2077 (2006). For this reason, Beach did not limit his analysis, as he had in his first avenue of relief, to the evidence discovered within the preceding twelve months. Rather, he also included evidence he had discovered prior to January 19, 2007. Beach maintained that, in light of all this evidence, no reasonable juror would have found him guilty of Nees’s murder.
¶99 It is important to note here that Beach did not raise a freestanding constitutional claim of innocence under Herrera, 506 U.S. 390,113 S. Ct. 853. A claim of innocence under Schlup-which is what Beach raised-“is procedural, rather than substantive.” Schlup, 513 U.S. at 314, 115 S. Ct. at 860. An adequate showing of innocence under Schlup “does not by itself provide a basis for relief’; instead, the petitioner’s relief depends critically on the validity of his underlying constitutional claims. Schlup, 513 U.S. at 315, 115 S. Ct. at 861. For Beach, the State’s withholding of evidence, the prosecutorial misconduct at trial, and the ineffectiveness of defense counsel are the substantive claims; his showing of innocence is simply the procedural prerequisite for obtaining review of those otherwise barred claims.
¶100 In contrast, a substantive or “freestanding” claim of innocence provides a basis for relief by itself. A substantive innocence claim does not allege constitutional violations at trial; to the contrary, it presumes that the underlying proceedings were “entirely fair and error free.” Schlup, 513 U.S. at 314, 115 S. Ct. at 860. The theory behind a substantive claim is that, although the trial proceedings were fair and error free, newly discovered evidence shows that the petitioner’s conviction is factually incorrect, and his execution or continued imprisonment would thus violate the Constitution. House, 547 U.S. at 554, 126 S. Ct. at 2086; Schlup, 513 U.S. at 313-17, 115 S. Ct. at *207 860-62; Herrera, 506 U.S. at 404, 417, 113 S. Ct. at 862, 869. Here, as noted, Beach did not claim that his trial was fair and error free. To the contrary, he asserted in his brief that “the new evidence discovered in this case, combined with correcting errors which occurred in the original trial, would result in Mr. Beach’s acquittal” under Schlup.
C. The State’s Response and the District Court’s Order
¶101 The State moved to dismiss Beach’s petition. As to his first avenue of relief, the State contended that Beach could not rely on § 46-21-102(2), MCA, to present his newly discovered evidence because the 1997 Legislature limited the applicability of this provision to convictions that became final after April 24, 1996. See Laws of Montana, 1997, ch. 378, §§ 9(1), 10. Since Beach’s conviction became final in 1985,[1] the State argued that he remained subject to the pre1997 five-year limitations period, making his January 2008 petition time barred. See Morrison v. Mahoney, 2002 MT 21, ¶ 11, 308 Mont. 196, 41 P.3d 320. As to Beach’s second avenue of relief under Schlup, the State argued that his new evidence “is not reliable nor is it compelling of either Beach’s innocence or someone else’s guilt.”
¶102 The District Court dismissed Beach’s petition in March 2008. In its one-page order, the court noted that the petition was procedurally and time barred, and that Beach’s proffered evidence “does not warrant a finding of actual innocence in support of the fundamental miscarriage of justice exemption [sic] to the time requirements.”
IV. Beach I
¶103 Beach appealed to this Court, which issued its decision in November 2009. We agreed with the State that Beach could not proceed under § 46-21-102(2), MCA, because his conviction became final before the statute’s effective date. Beach 1, ¶¶ 21-22. This conclusion disposed of Beach’s first avenue of relief.
¶104 Since Beach was subject to pre-1997 law, which provided a five-year statute of limitations with no statutory exception for newly discovered evidence, and since Beach’s January 2008 petition was thus untimely, we held that he could escape the time bar and obtain review of his claims “only if he can satisfy the fundamental miscarriage of justice exception.” Beach I, ¶ 24. This was the second avenue of relief Beach had argued in support of his petition. Although the District *208 Court concluded that Beach did not satisfy the miscarriage of justice exception, we observed that the court “failed to discuss ... the legal standard that it had applied.” Beach I, ¶ 25. We thus deemed it necessary to remand the case to the District Court with instructions to conduct an evidentiary hearing and to evaluate Beach’s evidence under “the correct legal standard.” Beach I, ¶ 51. The problem, in my view, and thus my concern about Beach Fs precedential value, is that our opinion did not set forth the correct legal standard.
¶105 This Court previously adopted the “gateway innocence” framework from Schlup as the standard for determining whether a fundamental miscarriage of justice exists. Redcrow, ¶¶ 33-34, 37; Pope, ¶¶ 55-59, 67-69. To pass through the gateway and argue the merits of his underlying constitutional claims, Beach had to show that, in light of new reliable evidence, it is more likely than not that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. Schlup, 513 U.S. at 324, 327, 329, 115 S. Ct. at 865, 867, 868. The District Court, in turn, had to consider all the evidence — Beach’s new evidence, as well as the evidence adduced at his 1984 trial-and make a probabilistic determination about what reasonable, properly instructed jurors would do based on the overall record. House, 547 U.S. at 537-38, 126 S. Ct. at 2077.
¶106 We did not direct the District Court to apply this well-considered approach, however. Rather, we fashioned a new test composed of elements from Clark, Schlup, and Sawyer and directed the District Court to apply it instead. Beach I, ¶¶ 37-48,51. Under law-of-the-case principles, the District Court and this Court are constrained to apply the Beach I test to Beach’s petition;[2] and, as noted at the outset, I believe the Court has resolved Beach’s present appeal under that test correctly. Nevertheless, Beach Fs new test lacks precedential support, and I fear that in devising it we have confused the law. For purposes of clarification, therefore, I shall explain three specific areas where I believe the Beach I analysis is incorrect or problematic, and set forth what in my view are the correct legal *209 principles that should apply in future cases.
A. Reliance on Clark
¶107 First, the Beach I test is based primarily on Clark. See Beach I, ¶¶ 37-38, 47-48. However, Clark did not involve the question whether the fundamental miscarriage of justice exception should be applied to a procedural bar. The five-factor Clark test was conceived to address a timely motion for a new trial under § 46-16-702, MCA. See Clark, ¶ 27 n. 3. The Clark test contemplates a defendant who files a motion for a new trial, based on newly discovered evidence, within 30 days following a guilty verdict. See Clark, ¶ 34; § 46-16-702(2), MCA; see also Br. of Respt. at 3, State v. Clark, http://searchcourts.mt.gov/index.html (Mont. Aug. 4, 2004) (No. 04-282) (reciting that Clark filed his motion for a new trial 30 days after the jury’s verdict).
¶108 A Clark defendant, therefore, is situated quite differently than a Schlup petitioner. A Clark defendant has only recently been convicted, and new evidence has been discovered since his trial. The new evidence is itself the basis for relief. If the evidence indicates that a new trial would have “a reasonable probability of resulting in a different outcome” (and if the other factors of the Clark test, such as diligence, are met), then the Clark defendant is entitled to a new trial. Clark, ¶ 34.
¶109 A Schlup petitioner, on the other hand, is years-perhaps decades-beyond the date of his conviction. His time for filing a motion for a new trial under § 46-16-702, MCA, has long passed, as has his time for pursuing a direct appeal. He is even barred from challenging his conviction through postconviction proceedings-unless he shows a fundamental miscarriage of justice. Unlike a Clark defendant’s new evidence, which is itself the basis for relief, a Schlup petitioner’s new evidence “does not by itself provide a basis for relief’; rather, his claim for relief is premised on constitutional errors in his original trial. Schlup, 513 U.S. at 315, 115 S. Ct. at 861. A Schlup petitioner offers new evidence in order to escape the procedural bar, i.e., “to pass through the gateway and argue the merits of his underlying claims.” Schlup, 513 U.S. at 316, 115 S. Ct. at 861. He must show “that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.” Schlup, 513 U.S. at 327, 115 S. Ct. at 867. Only if the Schlup petitioner makes a sufficient showing of innocence and prevails on the merits of his underlying constitutional claim(s) is he then entitled to relief.
¶110 Seen in this light, the Clark test is plainly inapposite to a *210 Schlup petitioner, and I believe we were wrong to make Clark the basis of the miscarriage of justice test in Beach I. It is true (see Beach I, ¶ 40) that we deemed it appropriate to apply the Clark factors to a postconviction petition alleging newly discovered evidence in Crosby, ¶ 20, and in State v. Abe, 2001 MT 260, ¶¶ 8-13, 307 Mont. 233, 37 P.3d 77. But in these two cases, we were not concerned with the miscarriage of justice exception, since Crosby and Abe could file their petitions under § 46-21-102(2), MCA. Crosby, ¶ 15; Abe, ¶¶ 6-8. Thus, Crosby and Abe were not authority to apply the Clark test to someone, like Beach, who (1) is not entitled to rely on § 46-21-102(2), MCA, and (2) has presented his newly discovered evidence not as a basis for relief, but as a basis for passing through the actual innocence gateway and arguing the merits of his trial-based constitutional claims.
B. Substantive versus Procedural Innocence Claims
¶ 111 My second point relates to our discussion of substantive versus procedural claims. We stated that the miscarriage of justice exception “concerns actual, or substantive innocence, rather than legal, or procedural innocence.” Beach I, ¶ 31. We also stated that “the ‘actual innocence’ inquiry may involve the interplay of substantive and procedural innocence claims.” Beach I, ¶ 43 (emphasis in original). In this connection, we indicated that once a petitioner shows actual innocence sufficient to pass through the procedural gateway, he may then (1) pursue relief for alleged constitutional errors in his original trial or (2) demonstrate his substantive innocence.[3] Beach I, ¶¶ 32-36, 43-45. Regrettably, this conception of substantive and procedural claims missed the mark and is prone to generate confusion.
¶112 It is true that the miscarriage of justice exception is concerned with “actual innocence,” as distinct from “legal innocence.” This distinction was mentioned in Sawyer, 505 U.S. at 339-40, 112 S. Ct. at *211 2518-19, and can be traced back to Smith v. Murray, 477 U.S. 527, 537-38, 106 S. Ct. 2661, 2668 (1986). Stated concisely, “ ‘actual innocence’ means factual innocence, not mere legal insufficiency.” Bousley v. United States, 523 U.S. 614, 623-24, 118 S. Ct. 1604, 1611 (1998). “A prototypical example of ‘actual innocence’ in a colloquial sense is the case where the State has convicted the wrong person of the crime.” Sawyer, 505 U.S. at 340, 112 S. Ct. at 2519. “Legal innocence,” in contrast, refers to a legal error in the trial that by itself requires reversal. Gandarela v. Johnson, 286 F.3d 1080, 1085 (9th Cir. 2002); Johnson v. Hargett, 978 F.2d 855, 859-60 (5th Cir. 1992). The miscarriage of justice exception applies only to a petitioner who demonstrates actual, factual innocence, not mere legal innocence. Indeed, that is the exception’s purpose: to permit review of an otherwise barred claim where the court is convinced that a constitutional violation has probably resulted in the conviction of one who is actually innocent. Schlup, 513 U.S. at 321, 115 S. Ct. at 864.
¶113 But to say that the exception concerns “substantive innocence, rather than . . . procedural innocence,” Beach I, ¶ 31, is confusing, as is the notion of an “interplay” between substantive and procedural innocence claims, Beach I, ¶¶ 36, 43-45. A claim of innocence, for purposes of the miscarriage of justice exception, “is procedural, rather than substantive.” Schlup, 513 U.S. at 314, 115 S. Ct. at 860. It is the mechanism by which the petitioner (if his showing of innocence is sufficient) may obtain review of an otherwise barred allegation of constitutional error in his original trial. A petitioner who shows actual innocence under the procedural/gateway standard has, in effect, established that the miscarriage of justice exception should apply to him and that his trial-based claim should be reviewed on its merits.
¶114 A substantive claim of innocence, on the other hand, is an independent avenue of relief apart from the miscarriage of justice exception. Herrera, 506 U.S. at 404-05, 113 S. Ct. at 862-63; Carriger v. Stewart, 132 F.3d 463, 477 (9th Cir. 1997) (en banc). The confusion arises because both claims-procedural and substantive-require a showing of “actual innocence” based on new evidence (with the substantive claim requiring “more convincing proof of innocence” than the procedural claim). House, 5A1 U.S. at 555, 126 S. Ct. at 2087; Carriger, 132 F.3d at 477. But the essential distinction is this: A sufficient showing of actual innocence under a substantive claim is a basis for relief by itself, whereas a sufficient (but lesser) showing of actual innocence under a procedural claim is a basis for escaping a procedural bar on an underlying constitutional claim. Schlup, 513 U.S. *212 at 313-15, 115 S. Ct. at 860-61. A successful substantive claim results in exoneration, whereas a successful procedural claim leads to judicial review of a trial-based constitutional claim which, if meritorious, then results in the grant of a new trial. See Opinion, ¶¶ 13, 14, 16.
C. Standard of Proof
¶115 My final point concerns the standard of proof. For substantive claims, we stated that “Beach must show by clear and convincing evidence that, but for a procedural error, no reasonable juror would have found him guilty of the offense.” Beach I, ¶ 44. For procedural claims, we stated that Beach must satisfy a modified version of the Clark test. Beach I, ¶¶ 45-48.1 believe both standards are incorrect.
1. Standard for Substantive Claims
¶116 The “clear and convincing” standard we articulated in Beach I for substantive innocence claims can be traced to Sawyer. In that opinion, the Supreme Court examined the miscarriage of justice exception as applied to a petitioner who claimed that he was “actually innocent of the death penalty.” Sawyer had filed a petition seeking review of constitutional claims relating to his sentence, but the claims were procedurally barred. Hence, the issue was what showing he had to make in order to satisfy the miscarriage of justice exception. The Supreme Court held that he “must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty.” Sawyer, 505 U.S. at 336, 112 S. Ct. at 2517.
¶117 The Supreme Court adopted this standard for a procedural innocence claim related to a petitioner’s death sentence, not a substantive innocence claim related to a petitioner’s conviction. See Sawyer, 505 U.S. at 347-50, 112 S. Ct. at 2523-25; Schlup, 513 U.S. at 324-26, 115 S. Ct. at 865-67. As to the latter, the Supreme Court has indicated that a substantive/freestanding claim-assuming such claims are cognizable[4]-would require “more convincing proof of innocence” than a procedural/gateway claim; indeed, “the threshold for any hypothetical freestanding innocence claim [would be] ‘extraordinarily high.’ ”House, 547 U.S. at 555, 126 S. Ct. at 2087 (quoting Herrera, 506 U.S. at 417, 113 S. Ct. at 869). With a freestanding claim-where there is no question about the fairness of the original trial-the new evidence must “unquestionably establish [the petitioner’s] innocence.” Schlup, *213 513 U.S. at 316-17, 115 S. Ct. at 862. With a gateway claim, on the other hand, the new evidence need only “raise[ ] sufficient doubt about [the petitioner’s] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error.” Schlup, 513 U.S. at 316-17, 115 S. Ct. at 862. The showing for a gateway claim is lower because
a petitioner claiming he falls within the miscarriage of justice exception asserts constitutional error at trial, [and thus] his conviction is not entitled to the same degree of respect as one concededly free of constitutional taint. Accordingly, a petitioner asserting both innocence and constitutional error “need carry less of a burden” with respect to innocence than a petitioner like Herrera who claimed only innocence.
Carriger, 132 F.3d at 477-78 (citing Schlup, 513 U.S. at 316, 115 S. Ct. at 861).
¶118 Beach I’s articulation of the showing required for a substantive innocence claim does not accurately reflect the high standard applicable to such claims. “[A] standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.” Schlup, 513 U.S. at 325, 115 S. Ct. at 866 (internal quotation marks omitted). In Carriger, the Ninth Circuit concluded that a petitioner asserting a substantive/freestanding innocence claim “must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.” 132 F.3d at 476. The court cited Justice Blackmun’s Herrera dissent as the origin of this standard.[5] Justice Blackmun, in turn, discussed two considerations that support the standard:
First, new evidence of innocence may be discovered long after the defendant’s conviction. Given the passage of time, it may be difficult for the State to retry a defendant who obtains relief from his conviction or sentence on an actual-innocence claim. The *214 actual-innocence proceeding thus may constitute the final word on whether the defendant may be punished. In light of this fact, an otherwise constitutionally valid conviction or sentence should not be set aside lightly. Second, conviction after a constitutionally adequate trial strips the defendant of the presumption of innocence. The government bears the burden of proving the defendant’s guilt beyond a reasonable doubt, but once the government has done so, the burden of proving innocence must shift to the convicted defendant. The actual-innocence inquiry is therefore distinguishable from review for sufficiency of the evidence, where the question is not whether the defendant is innocent but whether the government has met its constitutional burden of proving the defendant’s guilt beyond a reasonable doubt. When a defendant seeks to challenge the determination of guilt after he has been validly convicted and sentenced, it is fair to place on him the burden of proving his innocence, not just raising doubt about his guilt.
Herrera, 506 U.S. at 442-43, 113 S. Ct. at 882-83 (Blackmun, Stevens, & Souter, JJ., dissenting) (citations omitted). Notably, Justice Blackmun rejected the Sawyer standard as ill-suited to the substantive innocence inquiry. Herrera, 506 U.S. at 442 & n. 6, 113 S. Ct. at 882 & n. 6 (Blackmun, Stevens, & Souter, JJ., dissenting).
¶ 119 To summarize this discussion, the Herrera Court contemplated an “extraordinarily high” standard for a freestanding innocence claim. 506 U.S. at 417, 113 S. Ct. at 869. Likewise, the Schlup Court indicated that such a claim would fail unless the petitioner’s new evidence “unquestionably establishes]” his innocence. 513 U.S. at 316-17, 115 S. Ct. at 862. A petitioner raising a substantive claim of innocence concedes that his conviction was the product of a fair and error-free trial. The government has proved his guilt beyond a reasonable doubt, and he has thus been stripped of the presumption of innocence. If successful on his substantive claim, the petitioner is forever exonerated and the State may not retry him (see Opinion, ¶ 13). In light of these considerations, it seems apparent that we understated the appropriate standard of proof for a substantive claim in Beach I, ¶ 44. It is not enough to show (even by clear and convincing evidence) that no reasonable juror would have found the petitioner guilty.[6] To prevail on a substantive claim, the petitioner must go *215 beyond raising doubt about his guilt; he must affirmatively, and unquestionably, establish his innocence. Moreover, he must do so based on reliable new evidence and in light of the proof of his guilt at trial. Herrera, 506 U.S. at 417-19, 113 S. Ct. at 869-70. I would overrule Beach I and apply the foregoing standard-which, I note, is consistent with our recognition in Pope, ¶¶ 48-49, that while a Schlup petitioner “only has to be successful in convincing the reviewing court that a reasonable jury would not likely convict him in light of the new evidence,” a Herrera petitioner “must present new evidence that proves he or she did not commit the crime.”
2. Standard for Procedural Claims
¶120 As noted, we adopted a modified version of the Clark test as the framework for analyzing a procedural innocence claim. Beach I, ¶¶ 45-48. For the reasons already discussed, the Clark test was not envisioned to be used as a fundamental miscarriage of justice test, and it should not be applied for that purpose. See ¶¶ 107-110, supra.
¶121 As for the specific showing needed to prevail on a procedural/gateway claim, we opined in Beach I that Schlup, Redcrow, and Clark articulate “rough[ly] equivalent” standards, and we thus directed the District Court to apply Schlup and Redcrow as part of Clark’s fifth factor. Beach I, ¶¶ 45, 48, 51. I do not agree that the standards from these three cases are equivalent, nor do I agree that they can or should be fused into one.
¶122 First, under the fifth factor of Clark, “the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.” Clark, ¶ 34. Under Schlup, conversely, the petitioner must show that it is “more likely than not” that “no juror, acting reasonably, would have voted to find him guilty.” Schlup, 513 U.S. at 327, 329, 115 S. Ct. at 867, 868. We explained in Clark, ¶ 36, that the “reasonable probability’ standard is lower than the “more likely than not” standard (albeit, using the terms “probably” and “51 percent or greater chance” in lieu of “more likely than not”). The Supreme Court has made similar observations. Schlup, 513 U.S. at 327 & n. 45, 115 S. Ct. at 867 & n. 45; Schlup, 513 U.S. at 332-33, 115 S. Ct. at 870 (O’Connor, J., concurring). Showing “a reasonable probability of... a different outcome” is sufficient for granting a new trial to a defendant who files a motion within 30 days after a guilty verdict. But it is wholly insufficient for finding a fundamental miscarriage of justice that would warrant review of procedurally barred constitutional claims asserted years after the conviction. The miscarriage of justice exception must remain “rare” and be applied *216 only in the “extraordinary case.” Schlup, 513 U.S. at 321, 115 S. Ct. at 864.
¶123 Second, inRedcrow, we applied the foregoing Schlup standard in our evaluation of the petitioner’s claims. Redcrow, ¶ 37. But near the end of that same paragraph, we then stated: “A fundamental miscarriage of justice arises only when a jury could find, in light of new evidence, that the defendant is actually innocent of the crime.” Redcrow, ¶ 37. This is the language adopted at ¶¶ 48 and 51 oí Beach I. The question at the gateway stage, however, is not whether “a jury could find ... that the defendant is actually innocent.” Redcrow, ¶ 37. It is whether “any reasonable juror would have reasonable doubt.” House, 547 U.S. at 538, 126 S. Ct. at 2077. The gateway analysis focuses on what reasonable jurors would do, not what a jury could do. See Schlup, 513 U.S. at 330, 115 S. Ct. at 868 (distinguishing the standard governing claims of insufficient evidence-i.e., whether any rational juror could have convicted-from the standard governing Schlup-i.e., whether no reasonable juror would have convicted; the former focuses on “the power” of the trier of fact to reach its conclusion, while the latter focuses on “the likely behavior” of the trier of fact). The quoted language from Redcrow, ¶ 37, is not a correct statement of the law under Schlup’s gateway innocence standard.
¶124 Of course, in defining “fundamental miscarriage of justice” under Montana law, we are not required to adopt the same approach applied by the Supreme Court in federal habeas cases. Nevertheless, we purported to adopt the Schlup standard in Redcrow and Pope. In so doing, we indicated that “[t]he Supreme Court’s definition of fundamental miscarriage of justice comports with” our longstanding recognition of “the importance of applying procedural bars regularly and consistently.” Redcrow, ¶ 34. In my view, Schlup’s gateway approach is sensible and well-considered, and I would adhere to that approach in cases where a postconviction petitioner seeks to escape a procedural bar and obtain review of otherwise barred constitutional claims. When we inject into the analysis other standards and tests that were created for different purposes, we engender confusion and undermine Schlup’s clear analytical framework. For these reasons, I would overrule the Beach I test in its entirety and reaffirm the analytical approach set forth in Schlup.
D. Summary
¶125 In sum, a postconviction petitioner who alleges constitutional errors in his original trial, but who is procedurally barred from bringing those claims, must demonstrate a fundamental miscarriage *217 of justice in order to receive review of his claims on the merits. To do so, the petitioner must supplement his constitutional claims with a sufficient showing of factual innocence (as distinct from legal innocence). More specifically, the petitioner must come forward “with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial.” Schlup, 513 U.S. at 324, 115 S. Ct. at 865. The petitioner must show that, in light of this new evidence, it is more likely than not that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. Schlup, 513 U.S. at 327, 329, 115 S. Ct. at 867, 868.
¶126 The reviewing court, in turn, must examine all the evidence-old and new, incriminating and exculpatory-without regard to whether it would necessarily be admitted under the rules of admissibility that govern at trial.[7] Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do. Schlup, 513 U.S. at 327-29, 115 S. Ct. at 867-68; House, 547 U.S. at 538, 126 S. Ct. at 2077. The court’s function is not to make an independent factual determination about what likely occurred; rather, it is to assess how reasonable jurors likely would react to the overall, newly supplemented record. House, 547 U.S. at 538, 126 S. Ct. at 2077-78. While the standard is demanding, it does not require absolute certainty about guilt or innocence. The petitioner’s burden at the gateway stage “is to demonstrate that more likely than not, in light of the new evidence, ... any reasonable juror would have reasonable doubt.” House, 547 U.S. at 538, 126 S. Ct. at 2077. If the petitioner makes this showing, then the court will review his constitutional claims on the merits in a postconviction proceeding from which he previously was procedurally barred. If he prevails on his constitutional claims, then the petitioner is entitled to a new trial.
¶127 Distinct from this procedural/gateway innocence framework, *218 a petitioner may seek relief under a substantive/freestanding claim of innocence. There, the petitioner does not allege constitutional errors in his trial; he concedes that the proceedings underlying his conviction and sentence were “entirely fair and error free.” Schlup, 513 U.S. at 314, 115 S. Ct. at 860. He instead claims that his conviction is factually incorrect and that his execution or continued imprisonment would thus violate the Constitution. This requires “more convincing proof of innocence” than the gateway innocence standard requires. House, 547 U.S. at 555, 126 S. Ct. at 2087. The petitioner must go beyond raising doubt about his guilt and must establish his innocence affirmatively, and unquestionably, based on reliable new evidence and in light of the proof of his guilt at trial. Schlup, 513 U.S. at 316-17, 115 S. Ct. at 862; Herrera, 506 U.S. at 417-19, 113 S. Ct. at 869-70; Carriger, 132 F.3d at 476.
¶128 Finally, the question arises as to how § 46-21-102(2), MCA, is to be applied consistently with the Schlup and Herrera analyses in cases where § 46-21-102(2), MCA, is available to the petitioner. This section states:
A claim that alleges the existence of newly discovered evidence that, if proved and viewed in light of the evidence as a whole would establish that the petitioner did not engage in the criminal conduct for which the petitioner was convicted, may be raised in a petition filed within 1 year of the date on which the conviction becomes final or the date on which the petitioner discovers, or reasonably should have discovered, the existence of the evidence, whichever is later.
Section 46-21-102(2), MCA.
¶129 As discussed, we deemed it appropriate in Crosby to apply the Clark test to a timely petition filed under this section. Crosby, ¶¶ 15, 20. In light of the foregoing discussion of “actual innocence” claims, however, I question whether the Clark test is properly suited to analyzing such a petition. Under Clark, the defendant must show:
(1) The evidence must have been discovered since the defendant’s trial;
(2) the failure to discover the evidence sooner must not be the result of a lack of diligence on the defendant’s part;
(3) the evidence must be material to the issues at trial;
(4) the evidence must be neither cumulative nor merely impeaching; and
(5) the evidence must indicate that a new trial has a reasonable probability of resulting in a different outcome.
*219 Clark, ¶ 34. These factors bear on whether a new trial should be granted under § 46-16-702, MCA (the “new trial” statute); § 46-21-102(2), MCA, on the other hand, says nothing about a new trial. The Clark test, moreover, requires only a reasonable probability that a new trial will result in a different outcome; § 46-21-102(2), MCA, conversely, requires the petitioner’s evidence to “establish” that he did not engage in the criminal conduct for which he was convicted. The Clark test requires the court to assess the defendant’s diligence; § 46-21-102(2), MCA, however, has its own diligence standard: the petition is timely if it is filed within one year of the date on which the conviction became final or the date on which the petitioner discovered, or reasonably should have discovered, the existence of the evidence, whichever is later. The Clark test requires the evidence to be material to the issues at trial and not cumulative or merely impeaching; § 46-21-102(2), MCA, states no such criteria. In short, the Clark test and § 46-21-102(2), MCA, require distinct showings for differently situated individuals.
¶130 I note that the legislative history of § 46-21-102(2), MCA, while somewhat thin, is consistent with this conclusion. As originally proposed, House Bill 222 (1997) reduced the time limit on filing a petition for postconviction relief to one year, with no exceptions. Opponents of the bill argued that this categorical limitation ignored recent developments in DNA testing and would prevent courts from considering cases in which DNA testing proved unequivocally that the petitioner was innocent. Apparently in response to such objections, the House Judiciary Committee amended House Bill 222 to incorporate the “newly discovered evidence” exception now contained at § 46-21-102(2), MCA.
¶131 Based on the statute’s language, it appears § 46-21-102(2), MCA, is effectively-though perhaps not intentionally-a codification of the substantive/freestanding claim that the Supreme Court in Herrera (and again in House) only assumed, for the sake of argument, is cognizable under the federal Constitution and that this Court, likewise, has assumed exists but has never actually relied on to grant relief. An obvious difference is the one-year filing deadline in § 46-21-102(2), MCA. Neither the Supreme Court nor this Court specified whether a substantive innocence claim under the *220 Constitution[8] must be filed within a particular timeframe of discovering the new evidence. I do not believe it is necessary to resolve that question here, however. Until such time as it is necessary to decide whether the statute’s one-year limit should not control constitutional-based claims as well, I would avoid further complicating an already complex area of law and simply apply the above-stated standards for a substantive claim of innocence whether it is brought under the Constitution or under § 46-21-102(2), MCA. Thus, the petitioner must affirmatively and unquestionably establish his innocence, based on reliable new evidence discovered within the twelve months preceding the filing of his petition and in light of the proof of his guilt at trial.
V. Discussion of Beach’s Claim
¶132 The Court persuasively explains why Beach’s new evidence fails to satisfy the threshold requirement of the foregoing tests-specifically, his evidence is not “reliable.” Opinion, ¶¶ 23, 68-78. I agree with that analysis and join it. I also offer the following additional observations as to why Beach’s claims must fail.
A. Substantive Innocence
¶133 Under the “extraordinarily high” standard required for a substantive/freestanding claim of innocence, simply pointing the finger at other possible perpetrators-as Beach has attempted to do here, based largely on hearsay-is inadequate. Likewise, attempting to poke holes in one’s confession to the crime-as Beach has also attempted here, using the same arguments he made (and the jury rejected) in his 1984 trial-does not establish affirmatively and unquestionably that the petitioner is innocent. There is no DNA or other scientific evidence proving that Beach did not commit the crime. There is no trustworthy alibi evidence establishing that Beach was in another location when the crime occurred. There is no confession, let alone a reliable one, by another individual stating that he or she committed the crime and that Beach did not. The jury in Beach’s trial found beyond a reasonable doubt that Beach bludgeoned Nees to death with a crescent wrench *221 and a tire iron. Even assuming[9] that Beach raised a substantive innocence claim-i.e., that his conviction, although the product of a fair and error-free trial, is nevertheless factually incorrect-Beach’s evidence falls far short of proving that claim.
B. Procedural Innocence
¶134 In conducting our analysis at the gateway stage we must decide, based on all the evidence, whether it is more likely than not that no reasonable juror would have voted to find Beach guilty beyond a reasonable doubt. With that standard in mind, I cannot agree with Beach’s contention that his new evidence sufficiently establishes his actual innocence. Beach confessed to the crime. He did not simply say, “I did it.” Rather, he provided intimate and minute details of exactly how he committed the crime and then disposed of the evidence. With perhaps one exception (the description of what Nees was wearing that night), the details of his confession were consistent with the crime scene. Opinion, ¶ 29 n. 6. Importantly, Beach provided details that investigators previously were unaware of. For instance, he stated that he used a garbage bag when dragging Nees’s body to the river, which explained the lack of blood along the drag trail. While Beach posits that the Louisiana officers planted such details of the crime in his head, the transcript of a telephone conversation between Sheriff Mahlum and Sergeant Via reflects that Beach himself provided the details.[10] For example, Mahlum wanted to know exactly where Beach had thrown the pickup keys into the river. Beach replied that he had thrown the keys to his right, as he was facing Nees’s body, which meant upstream.
¶135 Contrary to Beach’s insinuations that Mahlum and the Louisiana officers engaged in a conspiracy to coerce him into giving a false confession to a crime he did not commit, there is no evidence substantiating this claim, let alone new evidence that the jury did not already consider when it rejected this theory back in 1984. *222 Furthermore, Beach has never provided a coherent and consistent explanation as to why he-a supposedly innocent man-confessed to brutally murdering Nees. Beach has gone from alleging that Calhoun told him he would “fry in the electric chair” if he did not confess, to claiming that the officers threatened him with homosexual advances, to contending that he sought only to please the officers so he could be returned to Montana, to asserting that he felt helpless after being held incommunicado for several days. Beach even offered the theory that the officers drugged his milkshake while he was being fed before his confession; yet, he also alleged the contrary theory that he had not been fed and was suffering from extreme hunger at the time of his confession. Bottom line: Beach’s theories of why he confessed are inconsistent and continually evolving, which serves only to undermine the credibility of all of them. More to the point, Beach has never presented a shred of credible evidence substantiating any of his explanations for giving a supposedly false confession.
¶136 The Supreme Court’s opinion in House provides insight into the sort of showing necessary to pass through the gateway and obtain review of barred constitutional claims. Not even the DNA evidence calling into question House’s involvement in the crime and the “evidentiary disarray” surrounding the blood evidence were enough to overcome the prosecution’s evidence against him. House, 547 U.S. at 540-48, 126 S. Ct. at 2078-83. The Supreme Court also considered compelling evidence that another suspect had murdered the victim-in particular, the victim’s husband. Two witnesses had provided credible testimony that the husband actually confessed to the crime; two more had described suspicious behavior by the husband (a fight and an attempt to construct a false alibi) around the time of the crime; and still other witnesses described a history of abuse. House, 547 U.S. at 548-53, 126 S. Ct. at 2083-85. After its consideration of all the evidence, the Supreme Court concluded that while the case was not one of conclusive exoneration, “the central forensic proof connecting House to the crime-the blood and the semen-has been called into question, and House has put forward substantial evidence pointing to a different suspect.” House, 547 U.S. at 553-54, 126 S. Ct. at 2086. Accordingly, the Supreme Court concluded that “although the issue is close, . . . this is the rare case where-had the jury heard all the conflicting testimony-it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt.” House, 547 U.S. at 554,126 S. Ct. at 2086. In contrast, as explained in this Court’s Opinion, and for the reasons just stated, there is simply no *223 reliable evidence that Beach falsely confessed to murdering Nees and that a “pack of girls” are instead responsible for her death.
¶137 Over the last 21 years, Beach has been through one federal habeas proceeding, including an appeal to the Ninth Circuit; two executive clemency proceedings; and two state postconviction proceedings. While he has persistently maintained his innocence throughout these proceedings, he has repeatedly failed to produce any reliable new evidence establishing that fact to the satisfaction of the board or tribunal involved. In its August 20, 2007 decision, the Montana Board of Pardons and Parole aptly observed that, “[u]ltimately, his statement to detectives that he had gone home after the murder and tried to convince himself that he did not do it, chilling as it is, provides what seems to this Board the likeliest explanation of what he is doing still.” As the Board further observed, in order to believe Beach’s claim that he did not do what his confession says he did, “we would have to believe that every single one of the law enforcement officers was steadfast in lying at the time the confession was taken, through the suppression hearing, through another trip to Montana for the trial, and even now when most have changed careers and one faces a life-threatening health crisis.” To adopt such a belief would require a far more persuasive evidentiary showing than Beach has made here.
VI. Conclusion
¶138 In conclusion, while I concur in the Court’s application of the Beach I analytical framework, I do so only for purposes of this case and Beach’s claims that are now before us. For purposes of future cases involving substantive or procedural claims of innocence, I would overrule Beach I and apply the standards that I have detailed above. Lastly, I agree fully with the Court’s analysis and conclusion that Beach’s new evidence is not reliable and, thus, that Beach’s innocence claims must fail. Opinion, ¶¶ 68-78.
¶139 I concur.
JUSTICE BAKER, JUSTICE RICE, and DISTRICT COURT JUDGE SIMONTON join the Concurrence of JUSTICE MCKINNON.

 Under the statutory definition, Beach’s conviction became final once this Court issued its decision in his direct appeal and the time for petitioning the United States Supreme Court for review expired. Section 46-21-102(1), MCA (1997).

 “When this Court, in deciding a case presented, states a principle or rule of law necessary to the decision, such pronouncement becomes the law of the case and must be adhered to throughout its subsequent progress, both in the trial court and upon subsequent appeal.” Winslow v. Mont. Rail Link, Inc., 2005 MT 217, ¶ 30, 328 Mont. 260, 121 P.3d 506. “This doctrine expresses the practice of courts generally to refuse to reopen what has been decided.” State v. Wagner, 2013 MT 47, ¶ 18, 369 Mont. 139, 296 P.3d 1142 (internal quotation marks omitted).

 This is explicit in our discussion of Beach’s claims (Beach I, ¶¶ 44-45) but more subtle in our discussion of Pope (Beach I, ¶¶ 33-36). After Pope successfully passed through the gateway, the State conceded his constitutional claims, and we thus remanded for a new trial. Pope, ¶¶ 67-68, 70. In Beach I, we reasoned that the State’s concession “obviated the need to evaluate whether Pope’s newly discovered evidence demonstrated his substantive actual innocence.” Beach I, ¶ 35. (Notably, Pope had “not made a substantive claim that the DNA evidence proves that he is truly innocent.” Pope, ¶ 55.) We then suggested that Beach and Pope are similar in that they both relied on new evidence to pass through the gateway, but that they are different in that, once through the gateway, Pope obtained relief for alleged trial-based constitutional violations whereas Beach seeks relief based on his substantive innocence. Beach I, ¶¶ 36, 44.

 The Supreme Court has only assumed, for the sake of argument, that substantive claims of innocence are possible under the federal Constitution. House, 547 U.S. at 554-55, 126 S. Ct. at 2086-87; Herrera, 506 U.S. at 417, 113 S. Ct. at 869.

 In the Herrera majority opinion, Chief Justice Rehnquist only assumed, for the sake of argument, that a substantive innocence claim is cognizable, and he thus did not articulate the standard for such a claim, except to note that it would be “extraordinarily high.” Herrera, 506 U.S. at 417, 113 S. Ct. at 869. Justice Blackmun, on the other hand, concluded that a substantive claim is cognizable, and he thus articulated what showing he believed is necessary to obtain relief under it. Herrera, 506 U.S. at 437, 441-44, 113 S. Ct. at 880, 882-83 (Blackmun, Stevens, & Souter, JJ., dissenting).

 For this reason, I would not apply the standard for freestanding claims stated at ¶ 13, ¶ 16, and ¶ 26 n. 4 of today’s Opinion in future cases.

 On this particular point, I believe our refusal in Pope to consider the petitioner’s confessions to the crime — one in a sworn statement; the other in open court-was error. See Pope, ¶¶ 6-10, 62. The State had promised not to use Pope’s confessions against him, but that did not preclude this Court from considering the confessions in determining whether he was “actually innocent” of the crime. By limiting our consideration of that question to “only admissible evidence,” Pope, ¶ 63, we violated Schlup’s command that the court consider all the evidence. Since the question is whether the petitioner is factually innocent, I agree with Justice Rice that the confessions were evidence of Pope’s guilt that should have been considered. Pope, ¶ 89 (Rice, J., & Gray, C.J., dissenting).

 Justice Blackmun concluded in Herrera that a substantive innocence claim is cognizable under the Cruel and Unusual Punishments Clause of the Eighth Amendment and under the Due Process Clause of the Fourteenth Amendment. 506 U.S. at 430-37,113 S. Ct. at 876-80 (Blackmun, Stevens, & Souter, JJ., dissenting). These correspond with Article II, Sections 22 and 17, respectively, of the Montana Constitution.

 Contrary to statements in Beach I that Beach brought “both substantive and procedural” innocence claims in his January 2008 petition, see Beach I, ¶¶ 43, 44, he actually raised only a procedural claim under Schlup, see ¶¶ 99-100, supra.

 Following his confession, Beach asked to speak with Mahlum. Via got in touch with Mahlum and then put Beach on the line. Beach asked Mahlum “to kinda keep it away from my mother till I get a chance to talk to her” because “[slhe’ll take it pretty hard.” Thereafter, Via and Mahlum spoke without Beach on the line, though it appears that Beach was close enough to provide answers, through Via, to Mahlum’s questions.